DATA MARKETING CO. OF VIRGINIA,
and Standard Development Association,
Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 00–595C.

United States Court of Federal Claims.

March 21, 2003.

Peter A. Cerick, Herndon, VA, for plaintiffs.

Dorris S. Finnerman, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Assistant Attorney General, and Director David M. Cohen, for defendant. John H. Raubitschek, National Technical Information Service, U.S. Department of Commerce, and Walter Thomas, Defense Logistics Agency, U.S. Department of Defense, of counsel.

## OPINION

FIRESTONE, Judge.

This breach of contract case comes before the court on the parties' cross-motions for summary judgment on liability. At issue are separate joint venture agreements entered into between the plaintiffs Data Marketing Company of Virginia ("DMC") and Standard Development Association, Inc. ("SDA") and the National Technology Information Service ("NTIS") within the United States Department of Commerce to provide the public with procurement-related data from the Department of Defense ("DOD"). Plaintiffs contend that they are entitled to damages for various breaches of their respective joint venture agreements with NTIS. For the reasons discussed below, the court finds that the United States ("defendant" or "government") is entitled to judgment as a matter of law, and therefore, the defendant's Motion for Summary Judgment is **GRANTED**.

## FACTS

### I. Background

The following facts are not in dispute unless otherwise noted. In 1995, Barry Nelsen, on behalf of Western Technologies Communications, Inc. ("WTCI"), a telecommunications company, approached DOD with a proposal to establish a privately-run website to disseminate the technical information contained in DOD solicitations to the public. Around the same time, Mr. Nelsen began discussions regarding the same concept with NTIS, which functions within the Department of Commerce as a clearinghouse for government information. After discussions with NTIS and DOD, it was suggested that if NTIS could obtain the technical data packages for DOD solicitations from the DOD, WTCI could provide the technical expertise, telecommunications equipment, infrastructure, and software to operate the procurement data dissemination program.

DOD was interested in Mr. Nelsen's proposal, but before agreeing to provide the data to NTIS, DOD hired Coopers & Lybrand (which later merged with Price Waterhouse to become PricewaterhouseCoopers) ("PWC") to examine the pros and cons of DOD entering into a Memorandum of Agreement ("MOA") with NTIS to provide the technical data packages on-line. In the re-

port, PWC recommended that DOD should enter into the MOA if certain issues could be successfully addressed. Of particular significance in the pending case, the Executive Summary noted that similar efforts to electronically provide solicitation information to the public were also underway within DOD and in the private sector, and thus, it would be important for DOD not to be seen as favoring a single private contractor:

Issues relating to the existing electronic commerce activities underway in the Department of Defense are also of concern. One of these is cited above as the potential conflict with the emerging [Federal Acquisition Computer Network "FACNET"] network of [Value-added Networks ("VANS"), "Network Entry Points ("NEPs")], etc. As we understand the plans by NTIS, [W]TCI and [Defense Logistics Agency ("DLA")], this should not be considered a duplication or conflict due to the intent to use the existing DoD structure for vendor submissions. In essence, the DLA–NTIS MOA provides another (more complete) information source that would not be the sole purview of [W]TCI. Other re-sellers and/or VANs could get the same data from NTIS and do their own conversions for re-sale....

Eliminating any appearance of favoritism towards [W]TCI is also of dramatic importance. We feel that it is important to conduct all dealings with NTIS and allow NTIS to deal with [W]TCI. NTIS is the accepted conduit for government information, and therefore, DLA can not be faulted in releasing information to NTIS. The best that DLA can do is to insist that NTIS, in its MOA and elsewhere, be impartial in its dealings with [W]TCI and other potential customers for DLA information.

A further, and substantial challenge for DLA is to integrate this project with many of the other technology initiatives being done throughout its centers. As stated earlier, the many projects being developed within DLA such as the [Defense Supply Center–Columbus, Electronic Bulletin Board System, the Automated Bid Interface] for the [World Wide Web], and the project being discussed here must be inte-

grated into one all-encompassing DLA business strategy. This will include review of these many projects and an analysis of what each project is costing DLA, as well as an assessment of where the most value is being added to the DLA customer....

Creating a perception that DLA has created a competitive advantage for [W]TCI or treated them preferentially is definitely an issue that needs to be considered. It is important that DLA is careful in its dealings with NTIS, [W]TCI, other data brokers and the vendor community so that equity and perceived equity are ensured.

PWC, Business Case Analysis of National Technical Information Service Memorandum of Agreement: Executive Summary Section I, 2, Section IV, 1–2. ["PWC, Business Case Analysis"]. Against this backdrop, PWC concluded that DOD should support both NTIS' efforts as well as other approaches.

Based upon PWC's recommendation, and in recognition of the significant savings DOD might realize if a web-based dissemination system of all DOD technically-related procurement data were available from every DOD procurement center, DOD agreed to provide NTIS with initial start-up funding for the NTIS procurement data clearinghouse. The NTIS clearinghouse was named the Technical Data Package Management Information System ("TDPMIS"). PWC was given responsibility for managing TDPMIS for NTIS and to work with NTIS and DOD to get the technical data from DOD to NTIS.

As set forth in the TDPMIS Prototype Project: Statement of Work ("SOW"), the goal of TDPMIS was to create at NTIS:

[A] centralized repository for publicly available, procurement related technical information in electronic format. Having such a repository provides vendors and trading partners, particularly small and medium sized enterprises, with timely access to military and federal specifications and standards, engineering drawings, and industry and international standards which are mandatory under procurement compliance requirements. The information contained in the repository will be supplied by the DoD, the Military Services, and DLA

and non-exclusively distributed by NTIS to the public.

SOW 1.

Under the original proposal, WTCI's SpecFinder search engine would be used to provide access to the DOD solicitations and any governmental standards, technical data, engineering drawings (supplied to NTIS by the procurement center, initially the DOD) and non-governmental standards (supplied to NTIS by the Standard Development Organizations ("SDOs")) called for in the solicitations. The standards, technical data, engineering drawings and non-governmental standards could then be downloaded through TDPMIS for a fee or purchased in paper form for a fee. Access to the TDPMIS website would be free. Fees would only be charged for ordering the materials in the TDPMIS databases.

## II. The Agreements with WTCI, SDA, and DMC

In order to implement TDPMIS, NTIS entered into a joint venture agreement with WTCI in July 1996 to implement the TDPMIS program. The agreement spelled out the obligations of each party and included a clause that allowed either party to terminate at will. The agreement also limited each party's liability to the other in the event of performance or nonperformance:

3. *Term and Termination* ....

3.2 ... [T]his Agreement may be terminated:

(a) by either NTIS or WTCI, upon at least five days' [sic] advance written notice to the other, given at any time prior to the commencement of the Operational Phase;

(b) by either NTIS or WTCI, upon at least ninety days' [sic] advance written notice to the other, given at any time following commencement of the Operational Phase; or

(c) by either NTIS or WTCI, immediately upon written notice to the other party, if the other party shall have failed to perform any of its material covenants or obligations under this Agreement, or if any of the representations or warranties of the other in this Agreement fail to be true and correct in any material respect, and such

failure shall have continued for a period of thirty days after written notice thereof given by the terminating party....

6. *Limitation of Liability.* NEITHER WTCI NOR NTIS SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES AS A RESULT OF ITS PERFORMANCE OR NONPERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT. NEITHER NTIS NOR WTCI MAKES ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO TDPMIS, THE WTCI SYSTEM OR PRODUCTS OR SERVICES THAT MAY BE SUPPLIED BY WTCI TO NTIS TO CUSTOMERS OR OTHERS, AND ALL SUCH WARRANTIES ARE DISCLAIMED. WTCI SHALL HAVE NO LIABILITY OR OBLIGATION WHATSOEVER FOR ANY FAILURE, OUTAGE OR INTERRUPTION OF THE WTCI SYSTEM OR THE DATA CIRCUITS ON WHICH THE [INVENTORY CONTROL POINT] IS TRANSMITTED TO WTCI. [Capitalized in original.]

7. *Relationship of Parties.* Nothing in this Agreement constitutes or shall be construed to constitute WTCI and NTIS as partners, and neither party shall have any power or authority to bind the other in any respect.

WTCI/NTIS Joint Venture Agreement 5–6.

NTIS also decided that TDPMIS would be enhanced if non-governmental standards frequently referenced in DOD procurements could also be made available electronically for a fee through NTIS. NTIS agreed to store and make available through TDPMIS any non-governmental standards that NTIS and Mr. Nelsen could contractually receive from SDOs.

Mr. Nelsen formed a new company, SDA, to contact and work with SDOs on behalf of NTIS. NTIS and SDA entered into a separate arrangement governing this program, entitled the Industry Standards Repository and Distribution Network ("ISRDN").

The SDA joint venture agreement, executed in August of 1996, required SDA to, among other things, "[m]ake contact with

authorized SDO representatives for the purpose of establishing distribution agreements with NTIS.... Assist NTIS management with the drafting and execution of distribution agreements.... Provide ongoing customer relations and communications with SDO representatives." SDA/NTIS Joint Venture Agreement 2.

For its part, NTIS was obligated to provide the facilities and technical expertise to store and access the ISRDN database. Under the terms of the agreement fees generated from sales of ISRDN data would be divided as follows:

> 3. *Revenue Distribution.* The net billed revenues (less SDO payments) generated from the sale of ISRDN documents will be divided between the Partners on a monthly basis on the percentages described below:
>
> SDA 8%
>
> NTIS 92%

*Id.* at 4. The agreement provided that any party, for any reason, could withdraw with sixty days written notice, "leaving the ISRDN project intact." *Id.* Under the agreement, the withdrawing party was obligated to work with a "designated party" for an additional 120 days for any transition of its "respective responsibilities to a designated party." *Id.* at 4–5. The agreement also provided that "[a]ny party withdrawing under Section 6 shall allow, to the extent allowable under their control, ISRDN to retain licenses previously provided by that party to the extent that such licenses are necessary for ISRDN to continue uninterrupted." *Id.* at 5. This agreement was expanded in August 1997 when the parties obtained Military and Federal Specifications and Standards ("MilSpecs"):

> 1. ISRDN will be expanded to establishing a repository of government and industry prepared non-government specifications and standards documents (Standards.)
>
> 2. Where applicable, references to [SDOs] will be expanded to include, provider(s) of Military/Federal Specifications and Standards.
>
> 3. NTIS will pay SDA for each electronic and hardcopy Standards document file sold from its system in accordance with the same payment terms and schedules described in the NTIS/SDA Joint Venture Agreement for hardcopy/fax distribution ....

Addendum to SDA/NTIS Joint Venture Agreement.

Before TDPMIS got underway, WTCI withdrew from the TDPMIS program on January 30, 1997. A wholly-owned subsidiary of WTCI, INtessera Technologies Group, Inc. ("ITG"), took WTCI's place. ITG had developed the SpecFinder program for WTCI.[1]

On August 13, 1997, ITG entered into an amended joint venture agreement with NTIS to continue work on TDPMIS. This amended agreement also included a newly-formed marketing company, DMC, owned and operated by Barry Nelsen.[2]

The amended joint venture agreement generally divided responsibilities among the three parties, provided for unilateral withdrawal, and limited each party's liabilities to each other under the agreement. Under the amended agreement, NTIS was generally obligated to "provide the ICP Data, the Standards and JEDMICS[3] drawings to ITG, provide and maintain the Standards on the NTIS System, and develop and provide marketing and billing support for TDPMIS and SpecFinder." DMC/ITG/NTIS Amended Joint Venture Agreement 4. ITG's role was

---

1. SpecFinder was the method of finding and procuring, through TDPMIS, complete technical data packages, which included "all documents and drawings required to submit an answer to a DoD procurement solicitation." Business Plan for NTIS' Electronic Commerce Support Systems 3.

2. DMC and SDA are related in their activities but came into existence through two different agreements. SDA's agreement was directly with ITG for the ISRDN project, or sales by NTIS of non-governmental standards. DMC performed a similar task, but sold its standards, acquired from NTIS, through SpecFinder via TDPMIS.

3. "ICP" is the DOD Inventory Control Point; "JEDMICS" is Joint Engineering Data Management and Information Control System; "Standards" is the collection of MilSpecs documents and Industry Standards.

generally described in the amended agreement as being "responsible for the development and provision of software, telecommunications support, and a channel for provision of TDP Products and Services by means of the ITG System, and data conversion services with respect to ICP Data."[4] *Id.* at 3. Finally, DMC's responsibilities were generally described as including consulting, planning and marketing with respect to TDPMIS and Specfinder, and providing Standards.[5] *Id.* at 6.

The amended joint venture agreement provided that fees generated by sales of data from TDPMIS would be divided as follows:

4.4 NTIS shall pay to ITG and DMC ... the following percentages of NTIS' gross receipts from such sale:

(i) to ITG 35 percent, and to DMC 5 percent, in the case of any TDPMIS sales of Raw Data; and

(ii) to ITG 60 percent, and to DMC 15 percent, in the case of any SpecFinder sales of all TDP Products and/or Services ....

*Id.* at 7. The amended joint venture agreement also provided:

2. *Limitation of Liability.* NONE OF THE PARTIES SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES AS A RESULT OF ITS PERFORMANCE OR NONPERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT. EXCEPT ONLY AS STATED IN THIS AGREEMENT, NONE OF THE PARTIES MAKES ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO TDPMIS, THE ITG SYSTEM, OR PRODUCTS OR SERVICES THAT MAY BE SUPPLIED BY THE PARTIES TO CUSTOMERS OR OTHERS, AND ALL SUCH WARRANTIES ARE DISCLAIMED. NEITHER ITG NOR NTIS SHALL HAVE ANY LIABILITY OR OBLIGATION WHATSOEVER FOR ANY FAILURE, OUTAGE OR INTERRUPTION OF THE ITG SYSTEM OR NTIS SYSTEM OR THE DATA CIRCUITS ON WHICH THE ICP DATA IS TRANSMITTED TO ITG. [Capitalized in original.]

9. *Relationship of Parties.* Nothing in this Agreement constitutes or shall be construed to constitute any of the Parties as partners, and none of the Parties shall have any power or authority to bind the other or others in any respect.

*Id.* at 8.

The amended joint venture agreement also identified each party's termination rights. Under the amended agreement any party could terminate at will upon advance written notice. The termination provision provided:

5.2 This agreement may be terminated:

(a) by any Party upon at least five days' [sic] advance written notice to the other Parties, given at any time prior to the commencement of the Operational Phase;

(b) by any Party, upon at least 180 days' [sic] advance written notice to the other Parties, given at any time following commencement of the Operational Phase; or

(c) by any Party, immediately upon written notice to the other Parties, if either of the other Parties shall have failed to perform any of its material covenants or obligations under this Agreement, or if any of the representations or warranties of the other in this Agreement fail to be true and

---

4. "TDP products and services" are "any and all products and services provided by the Parties consisting of or involving TDPs, whether provided as SpecFinder or TDPMIS." DMC/ITG/NTIS Amended Joint Venture Agreement 3. "ITG system" is a "comprehensive suite of equipment and facilities consisting of file servers and routers and a digital, private line interactive telecommunications network owned and/or operated by ITG." *Id.* at 2.

5. Like SDA, DMC sold standards. On the TDPMIS website, supported by the DMC agreement, there was a hyperlink to ISRDN where a purchaser could buy stand alone nongovernmental specifications. Through this hyperlink, when DMC sold a standard, revenue flowed to DMC because there was a sale through SpecFinder, but revenue also flowed to SDA, the original acquirer of the standard.

correct in any material respect, and such failure shall have continued for a period of thirty days after written notice thereof given by the terminating Party.

*Id.* at 7–8. There was nothing express within the amended joint venture agreement regarding exclusivity.

The amended joint venture agreement also included an "Integration" clause which provided as follows:

18. *Integration: Conflicting Documents.* This agreement sets forth the entire and only Agreement between the parties for the TDPMIS project, except the Memorandum of Understanding dated January 25, 1996, between NTIS and ITG, and amends and restates in its entirety the Original Joint Venture Agreement. Any representation, promise or condition, whether oral or written, not incorporated herein, shall not be binding on any party. No waiver, modification, or amendment of the terms of this Agreement shall be effective unless made in writing and signed by an authorized representative of both parties.

*Id.* at 11.

### III. Inter–Agency Agreements Between DOD and NTIS

As part of its responsibilities for implementing TDPMIS, NTIS entered into three agreements with DOD to obtain technical procurement-related data for TDPMIS. On January 23, 1997, NTIS and the DOD Office of the Deputy Under Secretary of Defense (Acquisition Reform/Electronic Commerce) ("ODUSD (AR/EC)") signed the first MOA, in which the DOD agreed to provide certain technical data available on Defense Information Systems Agency's ("DISA's") FACNET system to NTIS for its dissemination to the public at large:

1. To the maximum extent possible, ODUSD (AR/EC) will make unclassified, fully competitive procurement information, not otherwise restricted by law, to include Requests for Quotation (RFQ) and related technical information, available to NTIS in electronic format from FACNET. Such information will be provided to NTIS in a timely manner.... *NTIS agrees that it will be a non-exclusive distributor to the public of said information.*

ODUSD (AR/EC)/NTIS MOA 2 (emphasis added). The Agreement also stated that:

4. This Memorandum shall become binding and enter into force upon signature of both parties. It shall continue indefinitely unless one of the parties chooses to terminate the memorandum. Either party may terminate the agreement upon sixty (60) days written notice to the other party. To ensure no disruption of vendor access to procurement information, this agreement can be terminated only in accordance with the Continuity of Operations Plan referenced in the Concept of Operations document.

*Id.*

NTIS and DISA then entered into the second agreement, a Letter of Agreement ("LOA"), in November 1997, relating to DISA's obligations to provide its data to NTIS:

It is agreed that NTIS will provide at no cost to the Government the technical data associated with DoD solicitations to the commercial sector thereby relieving DoD activities of the burden of disseminating TDPs to the public. NTIS will fund the ongoing operation and maintenance of TDPMIS through revenues derived from subscriptions and sales of the technical data to its customers. In addition, NTIS adds other sources of technical data such as Military/Federal Specifications and Standards, Industry Standards, and Logistics data.

This LOA shall become binding and enter into force upon signature of both parties. It shall continue indefinitely unless one of the parties chooses to terminate the Agreement. Either party may terminate the Agreement upon one hundred and twenty (120) days' [sic] notice to the other party to this LOA. This Agreement will be terminated at such time as DISA transitions to Fee–for–Service. To ensure no disruption of vendor access to procurement information, this Agreement can be terminated only in accordance with an agreed upon Continuity of Operations Plan that will be separately developed by the LOA

participants and which shall not be inconsistent with this LOA.

DISA/NTIS LOA 3.

The third agreement, another MOA, was between NTIS and Defense Supply Center ("DSC")-Richmond. DSC–Richmond was the largest center in terms of available data for TDPMIS. The agreement states that "[t]he intent of this Agreement is to provide an immediate alternative to DSC[-Richmond's] traditional distribution methods while and until future initiatives are implemented." DSC–Richmond/NTIS MOA 1. The agreement provided that "NTIS agrees that it will be a non-exclusive distributor to the public of information provided under this Agreement." *Id.* at 2. The Agreement further provided that it could be terminated upon "sixty (60) days notice." *Id.* at 3.

Although there was never a formal agreement entered into between NTIS and DSC–Philadelphia and DSC–Columbus,[6] while agreements with these DSC centers were under negotiation, these DSC centers began to provide some data to NTIS in 1998.

No representative of the DOD was a signatory to either the SDA/NTIS Joint Venture Agreement or the DMC/ITG/NTIS Amended Joint Venture Agreement. DOD did however provide funding to NTIS to pay PWC for overall project management of TDPMIS.

For a short period of time, at the end of 1998 and early 1999, plaintiffs were retained by PWC, under its subcontract with NTIS and DOD for work on a new DOD program for electronic commerce known as "DoDBusOpps." DoDBusOpps was a website developed by DOD to promote information access for all DOD procurements. The plaintiffs' work relating to DoDBusOpps was wholly separate from the TDPMIS program and is not the subject of this litigation.

## IV. Program Implementation—Issues with ITG and NTIS under TDPMIS and ISRDN

Michael Williams was the program manager at NTIS for TDPMIS from its inception until September 1998. In 1997 and 1998, NTIS, through Mr. Williams and his staff, worked with ITG and Barry Nelsen (and his staff at SDA and DMC) on the TDPMIS program and the ISRDN program. As noted above, PWC was retained to act as project manager for TDPMIS on behalf of NTIS; PWC was, therefore, charged with obtaining the data from DOD for TDPMIS.

TDPMIS was an enormous technical effort for NTIS from 1997 until its termination. Including DSC–Richmond, DSC–Philadelphia and DSC–Columbus, ten pilot sites were intended to become operational during Phase I. NTIS had substantial technical and administrative staff dedicated to the project. For a variety of reasons, which are briefly discussed below, TDPMIS encountered various technical and programmatic problems.

There were numerous e-mails regarding a variety of technical problems relating to receiving data from DOD and the ability of the public to use the system. At one point, in December 1998, Mr. Nelson recommended that NTIS look to USA Information Systems to take over ITG's functions. E-mail from Barry Nelsen to Jerry Harper (December 16, 1998, 4:43 PM) with attached E-mail from Steve Murdock to Jerry Harper (December 16, 1998, 3:07 PM).

Approximately two months later, in February 1999, Mr. Nelsen wrote to ITG, complaining that ITG's SpecFinder search engine was causing problems for customers, "As you are painfully aware, I have for many months tried to tell you how bad things are within the document search." E-mail from Barry Nelsen to Donald Tolan (February 2, 1999, 3:34 PM). Both ITG and DMC were also very concerned with the problems ITG was having in getting data feeds from DSC–Columbus and DSC–Philadelphia. However, ITG was not having problems with DSC–Richmond, the only DSC with an agreement. *See* John William Block Deposition 106–07 ("[I]n the case of Richmond there was no interruption.").

ITG eventually complained to DOD about the problems with DSC–Columbus and DSC–Philadelphia. More specifically, on February

---

**6.** The DSC–Columbus draft Memorandum of Agreement is dated October 15, 1996 and the DSC–Philadelphia draft Memorandum of Agreement is dated February 17, 1997.

3, 1999, ITG wrote to General Glisson, Director of DLA, complaining of its problems with data flows from DLA:

[W]e had had over the last four years, virtually no cooperation from the ICPs in Philadelphia and Columbus. It was not until December of this past year, that we have started receiving data from Philadelphia and as of this date we believe we may soon start to receive drawings from Columbus, this after four years and several million dollars invested by our joint venture team.

Letter from Jon Block to General Henry Glisson (February 3, 1999). In addition, ITG accused DOD of unfairly competing TDPMIS through its support of another DOD web-based data system known as "Procurement Gateway." ITG suggested in its letter that DOD was intentionally interfering with TDPMIS' ability to secure data in order to promote its own DOD product:

While in normal cases we would understand competitive programs, we find it unbelievable that DLA and [Joint Electronic Commerce Programs Office ("JECPO")] would provide funds to compete against our initiative. We also find it blatantly unfair to compete while at the same time prevent us from having the data we have spent millions of dollars in trying to acquire from DLA. . . .

[W]e realize that DLA personnel are only trying to promote their own programs, but you must realize that organizations such as [Document Automation and Production Services] have spent millions upon millions digitizing data that already resides in the private sector, only to be given away free to Procurement Gateway, solely to compete against the Private sector.

*Id.* As discussed below, representatives of ITG and DMC did not meet with General Glisson's staff until after NTIS terminated the joint venture agreement.

**V. Procurement Gateway**

Procurement Gateway began as an electronic bulletin board in the early 1990s with DSC–Philadelphia. By February 1997, Procurement Gateway was able to provide solicitations, awards, drawings, specifications, standards, and quotes over the Internet. Once Procurement Gateway's capabilities were demonstrated, JECPO, DOD's new office of electronic procurement, agreed to provide limited funding in mid–1998.

Although there were many similarities between TDPMIS and Procurement Gateway, there were significant differences. Whereas, TDPMIS disseminated the procurement data in Hypertext Markup Language ("HTML") format, allowing for easier searching and manipulation of the data, Procurement Gateway disseminated data in Portable Document Format ("PDF"). Because PDF format was the only approved format for official DOD solicitations, specifically because it could not be manipulated, TDPMIS could not be considered an official source of DOD solicitations. TDPMIS, however, provided access to SDO data, which was not available through Procurement Gateway.

In January 1999, DOD asked PWC to perform a comparison of Procurement Gateway with TDPMIS. PWC noted that there were areas of overlap between the two systems, but concluded that TDPMIS was a better system than Procurement Gateway, both because TDPMIS was superior in the overlapping areas, and because TDPMIS offered SDOs. E-mail from Barry Nelsen to TDPMIS Team with attached PWC Comparison (January 26, 1999, 11:07 AM).

At this same time, NTIS was conducting an internal review of TDPMIS' profitability. In December 1998, Mr. Lawson, the director of NTIS, assigned Jerry Harper, an information technology expert, to become Mike Williams' replacement, as the program manager for TDPMIS. In January 1999, Mr. Lawson directed his staff to review all NTIS programs for their economic viability. Mr. Harper undertook a critical examination of the TDPMIS program and learned that TDPMIS was not profitable. At a January 1999 meeting among ITG, Mr. Nelsen and NTIS, Mr. Lawson, concerned with the dearth of actual revenue, indicated that he would give TDPMIS "one more shot to see whether the program would be successful or not." Ronald Lawson Deposition 49.

## VI. Program Termination

Despite positive reviews of TDPMIS, NTIS ultimately decided that it could not continue to support a project that was not creating revenue. NTIS's financial reports for fiscal years 1996 through 1999 show that NTIS suffered substantial losses throughout the program. Excluding items related to separate contractual arrangements (such as WTCI Software Distribution, ADCS, Scangraphics, PubNETics, and Cybermedia), NTIS lost a total of $34,142 in FY96; $410,081 in FY97; $1,088,745 in FY98; and $498,066 in FY99, for a total loss of $2,031,034. NTIS' cumulative loss through March 31, 1999, the month in which NTIS terminated the TDPMIS project, was $1,905,778. NTIS TDPMIS Detailed Reports YsTD 1996–1999.

NTIS strived to learn why TDPMIS was not making money. For example, Mr. Williams indicated to Mr. Nelson that it appeared that customers were using TDPMIS' search function, but were then obtaining the information discovered on the site from other sources for free:

> [T]he Web site is experiencing high volume hits, it's just that no one's buying. I think they use SpecFinder to determine what they need, and then go get it for free. Other's [sic] still don't know about TDPMIS because the centers are promoting their own solutions. And still, others don't care because as long as they can get TDP's for free they're not going to pay for them.

E-mail from Mike Williams [7] to Barry Nelsen (March 13, 1999, 3:44 PM). Mr. Williams also indicated that he thought that the DOD was to blame: "It's the DoD competitive posture ... thier [sic] willingness to invest more and more money into competing programs and by not supporting TDPMIS like they agreed to." *Id.*

Around this same time, Mr. Nelsen thought about withdrawing from TDPMIS. In February 1999, Mr. Nelsen wrote to ITG suggesting that it may be time for ITG and DMC to get out: "We could use both NTIS and DOD as an *excuse* to get out of this deal and maybe even ask for money from both parties." E-mail from Barry Nelsen to Donald Tolan (February 4, 1999, 10:29 AM) (emphasis added).

During February, Mr. Harper, at NTIS, concluded that there was no way that NTIS "would ever cover [its] costs in sales made through the TDPMIS program." Jerry Harper Deposition 54. Mr. Harper presented his opinion during a status meeting at NTIS where "[i]t was decided that [NTIS] would terminate because there was no chance of [TDPMIS] becoming a commercially-viable program." *Id.* at 56.

NTIS sent termination letters to all of the parties on March 5, 1999. The letters to ITG and DMC noted NTIS' desire to terminate the agreements in thirty days, stating that "the environment for delivering procurement-related technical data has changed dramatically and many of the original assumptions are simply no longer valid." NTIS Letters (March 5, 1999).

The letters explained that NTIS regretted the termination, but "[is] required by its organic legislation to be substantially self-sustaining. Accordingly, continued losses from this venture make it harder for [NTIS] to fulfill [its] core statutory mandate." *Id.* The letter also stated that "should the non-terminating parties wish to continue under the Joint Venture Agreement, as authorized by Section 5.3, they should consult with [JECPO]." *Id.* Mr. Nelson also received a letter, on behalf of SDA, regarding NTIS' decision to terminate its participation in ISRDN.

## VII. Post–Termination

ITG sent a response to NTIS' termination letter on March 5, 1999. ITG contended that a longer termination period was required by the agreement. ITG also expressed concern about DOD's other programs offering the same information "which has resulted in establishing a competitive role for the TDPMIS project." Letter from Donald Toland to Ronald Lawson (March 5, 1999). ITG requested NTIS to reconsider its decision. *Id.* NTIS replied to ITG on March 12, 1999 and

---

7. At this time, Mike Williams was no longer the program manager for TDPMIS.

agreed to abide by a final termination date of September 8, 1999.

On March 25, 1999, representatives of DOD, NTIS, ITG and DMC met to discuss ITG's February 3, 1999 letter to General Glisson and the possibility of the private joint venturers continuing on with TDPMIS. At the meeting, DOD explained that if ITG wanted to continue with TDPMIS, ITG, unlike NTIS, could not receive DOD's data for free but would have to become a Value–Added Network ("VAN")[8] and would have to pay for the data feeds under the Freedom of Information Act.

ITG responded on March 29, 1999, and based upon a belief that NTIS had canceled third-party agreements, asked that NTIS "immediately ... cease all actions to terminate or impair relationships with any third parties ...." Letter from Donald Toland to Ronald Lawson (March 29, 1999).

DOD continued to feed data electronically from the three pilot sites, DSC–Richmond, DSC–Columbus, and DSC–Philadelphia, to NTIS's server until ITG removed its server from NTIS grounds in June of 1999.

On April 3, 1999, NTIS offered to assist SDA in negotiating "replacement" agreements with the SDOs, but SDA never accepted NTIS' offer. Letter from Jerry Harper to Barry Nelsen (April 13, 1999); Jon Block Deposition 57–59; Jerry Harper Deposition 137–38; Jerry Harper II Deposition 79–80, 86; Barry Nelsen Deposition 513–14.

On April 19, 1999, Mr. Nelson wrote to NTIS, on behalf of both DMC and SDA complaining, in part, that NTIS:

> [I]s notifying content provisioners or notice of cancelation [sic] without regard to the [Joint Venture ("JV")] partners desire to maintain those relationships.
>
> . . .
>
> It is one thing for your organization to pull back from a venture that is not making money, it is entirely a different matter when your organization is the sole reason for the technical failure and then to inten-

tionally destroy what systems and agreements might be left for the JV partners.

Letter from Barry Nelsen to Ronald Lawson (April 19, 1999).

Mr. Nelsen eventually met with NTIS to discuss the failure of TDPMIS and ISRDN in early May. After the meeting, Mr. Nelsen wrote Mr. Toland that NTIS was "willing to write whatever letter to whomever to explain why they want out and this inlcudes [sic] the SDOs." E-mail from Barry Nelsen to Donald Toland (May 4, 1999, 1:19 PM).

ITG and DMC agreed not to continue with TDPMIS and the parties, including NTIS, signed a termination agreement changing the termination date from September 8, 1999, to June 23, 1999. The termination agreement stated that:

> From and after the date of this Termination, none of the Parties shall have any liability or obligation to any other Party under or pursuant to the Agreement; *provided, however,* that (a) nothing shall relieve any Party for any liabilities or obligations arising under or pursuant to the Agreements prior to the date of this Termination, and (b) Sections 8, 12, 14, 15 and 16 of the Agreement shall survive this Termination.

June 23, 1999 Termination Agreement. SDA did not sign a similar agreement with respect to ISRDN.

Although the SDA joint venture agreement provided a mechanism for continuing ISRDN without NTIS, it is not disputed that SDA never requested, in writing, that NTIS transfer the documents and data in the ISRDN database to SDA or any other "designated party." The Agreement states: "In the event that either party withdraws from the Joint Venture, the withdrawing party will cooperate in the transition of its respective responsibilities to a designated party. Transition will be accomplished within 120 days after 60 days written notice." SDA/NTIS Joint Venture Agreement 5; *see* Jerry Harper II Deposition 99–100.

---

**8.** A VAN is a type of "data broker." TCI/NTIS Proposal (March 22, 1996). In other words, it is a private network/communication provider that is hired to facilitate electronic data interchange or provide other network services.

On July 1, 1999 NTIS sent notices to all of the ISRDN contributors that NTIS was exercising its rights under its various Distribution Agreements to terminate the agreement and erase the data from its database. In most instances the effective date for terminating the on-line data was thirty days.[9]

In addition, there was an earlier termination of the distribution agreement between NTIS and American Society for Testing and Materials ("ASTM") regarding on-line distribution. In late 1998, during negotiations with ASTM concerning the on-line test program, ASTM demanded a short-term agreement, and further demanded that NTIS include a special web link containing copyright notices when visitors encountered an ASTM standard. Both of these terms were unacceptable to NTIS. When ASTM maintained that the special link was necessary, the parties had reached an impasse and the test program expired at ASTM's direction. Nonetheless, NTIS continued to provide ASTM standards in hard copy form pursuant to the separate agreement until October 6, 1999.

Internal correspondence between NTIS staff indicates that by August 8, 2000, NTIS had deleted all SDO standards from its system: "[A]ll Standard collections have been deleted from the system and are no longer available from NTIS. As part of this agreement to discontinue selling the standards, NTIS also agreed to purge all paper and images of the standards." E-mail from Sue Feint to Mike Bond, Larry Placanica, Doug Campion (August 8, 2000, 10:55 AM).

## VIII. The Present Litigation

The plaintiffs, DMC and SDA, filed suit in this court on October 3, 2000. The complaint named the United States as defendant. In their complaint, the plaintiffs assert that the government, through DOD, breached the joint venture agreements by funding Procurement Gateway, a competing entity, by failing to provide technical data, and by directing NTIS to terminate the agreements with DMC and SDA. The plaintiffs also assert third-party beneficiary claims of breach of inter-agency contracts by DOD. Finally, the plaintiffs assert a right to damages based on the government's alleged breach of fiduciary duty. Plaintiff DMC demands "loss of profits, costs incurred and misappropriation of intellectual property[10] in the amount of [$20,774,129] . . . ." Complaint 24. Plaintiff SDA demands "loss of profits and costs incurred in the amount of [$7,639,442] . . . ." *Id.*

The court bifurcated liability from damages. The parties conducted discovery, and filed cross-motions for summary judgment on liability. Oral argument was heard on December 9, 2002.[11]

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See* Rules of the Court of Federal Claims 56(c). "[T]he mere existence of *some* alleged factual dispute be-

9. Agreements terminated were with: Manufacturers Standardization Society of the Valve and Fittings Industry, Inc.; American Society of Heating, Refrigerating and Air–Conditioning Engineers, Inc.; Acoustical Society of America; American Society for Testing and Materials; National Fire Protection Association; Aerospace Industries Association of America, Inc.; Instrument Society of America; Society of Automotive Engineers, Inc.

10. Having failed to object on summary judgment to the government's reply concerning plaintiff DMC's intellectual property claim, this court considers the plaintiff to have conceded the intellectual property claim. This court therefore en-

ters summary judgment against the plaintiff on that count. Rules of the Court of Federal Claims 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

11. Supplemental briefs were filed after the oral argument. That briefing is now completed.

tween the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

## II. DMC's CLAIMS

### A. Introduction

DMC argues that DOD breached DMC's Joint Venture Agreement by (a) supporting Procurement Gateway to compete with TDPMIS, (b) intentionally withholding data feeds from DOD to TDPMIS, and (c) directing NTIS to terminate the DMC joint venture agreement. Each of these contentions will be examined in turn. However, before turning to those issues the court must first examine the threshold issue of whether DOD can be liable for breaching an agreement to which it was not a party.

### B. DOD was not a party to the DMC joint venture agreement

■ It is well-settled that in order to sue the government for breach of contract the contractor must show that it is in privity with the breaching party. *See United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed.Cir.1983); *Lockheed Martin Corp. v. United States,* 50 Fed.Cl. 550, 557 (2001). In addition, it is equally well-settled that a contract with one agency of the United States is not a contract with any other agency of the United States. *L'Enfant Plaza Properties, Inc. v. United States,* 1981 WL 30785 (1981), *aff'd in part and rev'd in part,* 230 Ct.Cl. 447, 678 F.2d 167 (1982); *Town of Kure Beach v. United States,* 168 Ct.Cl. 597, 608–12, 1964 WL 8528 (1964). Tested by these standards DMC's claims against the United States, based on the actions of DOD, must be dismissed.

■ Here, it is not disputed that DOD was not identified as a party to the DMC joint venture agreement. The joint venture agreement states at the outset that the "parties" are: NTIS, ITG and DMC. In addition, DOD did not sign the agreement with the joint venturers. DOD is identified as a source of data for TDPMIS, and as a sponsor of TDPMIS with NTIS, but DOD, in contrast to the "parties" to the agreement, was not given "obligations" under the agreement nor a right to revenues. Thus, while it is true that DOD supported NTIS' efforts by funding PWC to help manage TDPMIS, DOD did not have a direct relationship with DMC. DOD's relationship with TDPMIS was set forth in a separate MOA with NTIS, which pre-dated the DMC joint venture agreement. DOD then entered into other data sharing agreements with NTIS, which did not reference DMC in any way. Without any evidence of a direct contractual relationship between DOD and DMC, the court agrees with the government that DMC's breach of contract claims, based on the actions of DOD, must fail as a matter of law.

DMC's reliance on various cases to suggest that NTIS was merely DOD's agent, and thus, DOD was the real party in interest, is misplaced. *See L.W. Foster Sportswear Co. v. United States,* 186 Ct.Cl. 499, 405 F.2d 1285, 1291–92 (1969); *J.A. Jones Const. Co. v. United States,* 182 Ct.Cl. 615, 390 F.2d 886, 891–92 (1968). In contrast to those cases where one federal agency acts as the agent for another agency for the purpose of obtaining goods or services, NTIS, in the instant case, was not DOD's agent. NTIS created TDPMIS to provide procurement information to the public. The fact that DOD provided data for TDPMIS and funds to help manage TDPMIS on behalf of NTIS does not alter this result. Ultimately, TDPMIS was intended to make a profit for the joint venturers through the sale of DOD and other procurement-related data. It was clear from the outset that DOD would not share in the "billing and revenue distribution" system which was at the core of the joint venture.[12]

---

12. DOD's decision to not join the project was express, leaving the information dissemination function solely to NTIS without DOD's input:

While DoD activities have the authority to sell information products, the effort to do so must be absorbed within each activity's operational

*See* 44 U.S.C. §§ 3506(d)(1)(A), (4)(A). In addition, although DOD hoped that TDPMIS would help it fulfill its mission, by providing procurement data to the widest possible audience at the lowest cost, TDPMIS was not created for DOD. DOD was creating and supporting many procurement dissemination systems. In such circumstances, DOD was not the real party in interest under DMC's joint venture agreement. As such, DMC cannot state a claim for relief against the government for breach of contract based on the actions of DOD. DMC's breach of contract claims based upon the actions of DOD must be dismissed as a matter of law.[13]

**C. Even if DOD were deemed to be a party to the DMC joint venture agreement, DOD did not breach of the joint venture agreement**

Although DOD was not a party to the DMC joint venture agreement and was not bound by its terms, for the reasons that follow, the court finds that even if privity of contract were satisfied, DMC's breach of contract claims based on DOD's actions would still fail. An examination of the joint venture agreement reveals that none of the acts of wrongdoing by DOD alleged by DMC give rise to a breach of the DMC joint venture agreement.

DMC charges DOD with violating the joint venture agreement by (1) funding a competing government-owned web-based procurement information system, (2) intentionally withholding data from TDPMIS, and (3) wrongfully terminating TDPMIS. Each will be examined below.

**1. DOD did not breach any agreement by funding Procurement Gateway**

An examination of the joint venture agreement reveals that the government did not promise DMC that it would not invest in or support other government operated web-based procurement information systems. To the contrary, as discussed below, the government made it clear from the outset that DOD was developing and supporting other web-based procurement information systems. Absent an agreement from DOD not to support other web-based systems, DMC's contention that DOD breached the DMC joint venture agreement is unfounded.

It is well-settled that the parties are bound by the express terms of their written contract. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir.1996). In addition, where as here, there is an integration clause, which states that this agreement constitutes "the entire and only Agreement between the parties for the TDPMIS project," the court will ordinarily only look to the four corners of the document to determine the parties rights and obligations. *Id.* Thus, to the extent the court were to consider DOD to be a party to the joint venture agreement, DOD would be bound only by the terms of the joint venture agreement, and DOD would be liable only to the extent it violated the terms of that agreement.

---

budget. With increasing constraints on the sizes of DoD operational budgets and the current administration's direction that both military and civilian end strength reductions be absorbed, it would appear inappropriate for a DoD activity to support the information distribution function, its costs in supplies, technology and personnel, when that function is specifically assigned to NTIS.
Memorandum by Richard Payne to Richard Clark (November 1, 1997).

**13.** It appears to the court that DMC's breach of contract claims based on the actions of DOD actually sound in tort. DMC appears to contend that DOD tortiously interfered with DMC's joint venture agreement by undermining the success of TDPMIS. *See Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997); *Pinkston v. United States,* 6 Cl.Ct. 263, 267 (1984); *Berdick v. United*

States, 222 Ct.Cl. 94, 612 F.2d 533, 536 (1979); *see also McCauley v. United States,* 38 Fed.Cl. 250, 264 (1997) ("Jurisdiction to hear tort claims is exclusively granted to the United States District Courts under the Federal Tort Claims Act."), *aff'd,* 152 F.3d 948 (Fed.Cir.1998). The Federal Tort Claims Act, expressly bars actions against the United States for business torts. 28 U.S.C. § 1346(b)(1) (2003) ("The district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

Here, it is clear from reviewing the joint venture agreement that DOD did not breach the joint venture agreement by supporting Procurement Gateway. The undisputed facts make it plain that none of the parties made any commitments to each other regarding their right to support projects that might ultimately compete with TDPMIS. Indeed, the undisputed facts demonstrate that DMC was aware that DOD would not commit to support only TDPMIS as DOD's sole web-based procurement information system well-before DMC entered into the joint venture agreement with the government. As set forth in the Executive Summary of PWC's initial study, PWC identified DOD's obligation not to favor the joint venturers over other similar projects:

> Issues relating to the existing electronic commerce activities underway in the Department of Defense are also of concern. One of these is cited above as the potential conflict with the emerging FACNET network of VANS, NEPs, etc. As we understand the plans by NTIS, [W]TCI and DLA, this should not be considered a duplication or conflict due to the intent to use the existing DoD structure for vendor submissions. In essence, the DLA–NTIS MOA provides another (more complete) information source that would not be the sole purview of [W]TCI. Other re-sellers and/or VANs could get the same data from NTIS and do their own conversions for re-sale.

PWC, Business Case Analysis, Section IV 1.

Further, DMC had actual knowledge that DOD was incubating several of its own web-based procurement information systems. For example, Procurement Gateway had a booth next to TDPMIS at various trade shows promoting government procurement programs. *See* Donald Toland Deposition 48–51; Richard Clark Deposition 204. In these circumstances, DMC cannot establish a breach of the joint venture agreement on the grounds that DOD did not give complete loyalty to TDPMIS. DOD made it clear from the creation of TDPMIS that DOD would support and promote other web-based systems, including government-operated systems.

In addition, there is nothing in the course of dealings between the parties to suggest that there was an implicit agreement among the parties that DOD would not support potentially competing systems. To the contrary, the parties expressly stated in the agreement that they were not "partners." The agreement states: "Nothing in this Agreement constitutes or shall be construed to constitute any of the Parties as partners ...." DMC/ITG/NTIS Amended Joint Venture Agreement 8. Ordinarily joint venturers are considered to be partners and thus owe to each other certain fiduciary obligations. *Sadelmi Joint Venture v. Dalton,* 5 F.3d 510, 513 (Fed.Cir.1993); *Pine Products Corp. v. United States,* 945 F.2d 1555, 1560 (Fed.Cir.1991). Here, in contrast, the parties expressly exempted themselves from any fiduciary obligations. In such circumstances, there was nothing implicit in the joint venture agreement which would support a finding of liability based on DOD's decision to fund Procurement Gateway. The joint venturers knew from the outset that TDPMIS was one experiment among many by DOD to provide better information to potential government contractors.

**2. DOD did not breach any agreement by failing to provide data to NTIS**

DMC's breach of contract claims based on DOD's withholding of data must also fail as a matter of law. First and foremost, the joint venture agreement includes an express "Limitation of Liability" clause in connection with each party's obligations under the agreement. The clause states in capital letters: "NONE OF THE PARTIES SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES AS A RESULT OF ITS PERFORMANCE OR NONPERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT." DMC/ITG/NTIS Joint Venture Agreement 8. The clause goes on to state that "NEITHER ITG NOR NTIS SHALL HAVE ANY LIABILITY OR OBLIGATION WHATSOEVER FOR ANY FAILURE, OUTAGE OR INTERRUPTION OF THE ITG SYSTEM

OR NTIS SYSTEM OR THE DATA CIRCUITS ON WHICH THE ... DATA IS TRANSMITTED ...." *Id.* Thus, by its terms, the contract precludes a finding of liability for *any failure* in connection with the receipt of data.[14] Because DMC's claim rests on its contention that DOD interrupted the data feeds, its claim is barred by the contract. The agreement bars recovery for "any interruption," intentional or otherwise. Although the court would not condone such action, even if DOD had intentionally interrupted service from the two DLA sites to ITG, the contract provides that DOD (again, assuming it was a party to the agreement) would not face any contract liability for its actions.[15] Where, as here, a contract expressly bars recovery, the claim must be dismissed. *See David Nassif Assoc. v. United States,* 226 Ct.Cl. 372, 386, 644 F.2d 4 (1981) ("[T]he assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing."); *Andallo v. Federal Express Corp.,* 52 Fed. Appx. 991 (9th Cir.2002).

Moreover, contrary to DMC's contentions, the facts presented by DMC do not support a finding of intentional interruption of data flows, in any event. Ordinarily, in order to show bad faith by the government, there must be evidence of the government's specific intent to harm plaintiffs. *Asco–Falcon II*

*Shipping Co. v. United States,* 32 Fed.Cl. 595, 605 (1994); *Continental Collection & Disposal, Inc. v. United States,* 29 Fed.Cl. 644, 652 (1993) ("To demonstrate bad faith, specific instances of the government's ill will directed toward the plaintiff must be identified.") (Citation omitted). In addition, the courts require proof of such intent with "hard facts;" proof of wrongdoing by the government cannot rest on "suspicion and innuendo." *CACI, Inc. v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983).

Here, DMC's entire case rests on conclusory allegations that DOD intentionally withheld data to TDPMIS from the DSC–Philadelphia and DSC–Columbus locations in order to help Procurement Gateway. A review of the undisputed facts demonstrates that DMC has no evidence to show that DOD took steps to intentionally harm the joint venture or DMC. DMC argues that a "CONNECT THE DOTS" memo indicates a DOD plan for Procurement Gateway to take over TDPMIS and that this demonstrates DOD's true motives. However, a review of this document proves that it is merely a slide presentation by DLA to JECPO concerning Procurement Gateway. The document does not contain any information concerning the planned demise of TDPMIS. Instead, the document is simply another indication that TDPMIS had competition.[16]

---

**14.** DMC argues that where, as here, the only damages available to it would be lost revenues, those revenues should not be considered consequential damages. The government counters that the damages relate to payments by third parties, the damages are in fact consequential or incidental. The court agrees. "The plaintiff's claim for a loss of business profits—a reduction in income ...—is normally a claim for consequential damages." 3 Dobbs Law of Remedies § 12.4(3) (1993). Even if the data feeds were not the basis for DMC's arguments for consequential damages, the express contract is controlling in disallowing for any damage recovery. This court cannot go beyond the contract to grant DMC lost revenues when it clearly contracted away the right to recover them.

**15.** The joint venture agreement clearly states that "punitive" damages are disallowed.

**16.** An accompanying email describes the program's intention:

We intend to fully integrate the user interfaces of Procurement Gateway (Solicitations and Awards), with the Automated Bidsets Interface (ABI), with the Internet Quoting System (IQS), with the ASSIST DODS SP DOD Specs and Standards, into a single system that would be transparent to the end-user ... for the purpose of proviging [sic] ease of use and ease of entry into this acquisition system. ... [The program would] provide a single screen access where by vendors would be able to identify solicitations, and whether or not the solicitation would have corresponding drawings and/or spec standards. In addition, this capability would also allow for the electronic delivery of the drawing and/or spec or standard via the Internet (Web) for download. One point of record here, is that this access would be made availbale [sic] to the DLA vendor community for free. Something the vendor community and the SBA would really embrace.

E-mail from Ralph Colavita to Wil Bailey, Rick Clark, Claudia Knott, and Denise Mutscheller (May 11, 1998, 1:13 PM). Again, there is no indication in the accompanying email that the purpose of DOD's support of Procurement Gateway was to undermine TDPMIS.

Moreover, the facts show that DMC's data flow complaints stem from DLA facilities where there was no specific agreement to provide data to TDPMIS. In contrast to DSC–Richmond, which had an express agreement with NTIS, DSC–Philadelphia and DSC–Columbus did not have agreements with NTIS. Indeed, there is no evidence to suggest that DOD caused intentional interruptions of data flows to TDPMIS for *the purpose of keeping the joint venture from selling the data to the public.* Without any evidence of DOD acting with malice against the joint venture, DMC's breach of contract claims, based on DOD's failure to provide consistent data flows from the Philadelphia and Columbus sources, must fail.

### 3. DOD did not breach the agreement because of an improper termination

Finally, DMC argues that DOD breached the joint venture agreement by impermissibly ordering NTIS to terminate TDPMIS in an effort to deprive DMC of its profits under the joint venture. DMC argues in a similar vein that DOD's decision to cut off all data feeds following the notice of termination also breached the termination clause.

DMC's breach of contract claim on these grounds must also fail. To begin with, DMC's use of the word "termination" is not proper. The government did not terminate TDPMIS, it withdrew its support from the program. Indeed, at the heart of DMC's case is the misconception that the joint venture agreement was a contract by the government for goods and services subject to traditional government contract principles. In fact, the joint venture agreement was nothing of the kind. In fundamental contrast to a traditional government contract, the joint venture agreement gave the right to withdraw from TDPMIS to each of the parties to the agreement. *See Tuf Racing Products, Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 589 (7th Cir.2000) ("If a

party has a legal right to terminate the contract (the clearest example is where the contract is terminable at will by either party), its motive for exercising that right is irrelevant.") (Citation omitted.); *Major Oldsmobile, Inc. v. General Motors Corp.,* 101 F.3d 684 (2nd Cir.1996) ("As long as a party has 'the legal right to terminate its obligation under the contract, it is legally irrelevant whether [the party] was also motivated by reasons which would not themselves constitute valid ground for termination of the contract.'") (Citation omitted.); *Triangle Mining Co., Inc. v. Stauffer Chemical Co.,* 753 F.2d 734, 740 (9th Cir.1985) ("[W]hen the right to terminate a contract is absolute under the clear wording in the agreement the motive of the party in terminating such an agreement is irrelevant to the question of whether the termination is effective.") (Citation omitted.). The ordinary rules governing contract terminations do not apply. *Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183, 1193–94 (5th Cir.1985). For this reason, DMC's reliance on several e-mails and statements by DOD personnel suggesting that DMC's contract be terminated for convenience is misplaced. A review of the record reveals that the only contract subject to termination for convenience would have been DMC's subcontract with PWC in connection with DoDBusOpps. Those contracts are not at issue in this litigation.

Under the terms of the joint venture agreement, any party could end its relationship with the joint venture by simply providing notice. The termination clause permitted the government, as well as DMC and ITG, to abdicate their responsibilities under the agreement for any reason. In such circumstances, DOD was free to withdraw from TDPMIS upon giving notice. Therefore, the fact that DOD may have wanted to end its relationship with TDPMIS is of no legal consequence. DOD had no obligation to support TDPMIS for any period of time.[17] Since it is

---

17. For this reason, DMC's reliance on several internal DOD e-mails following ITG's letter to General Glisson, to the effect that several DOD components and personnel wanted to end DOD's relationship with TDPMIS, does not provide evidence of a breach of the joint venture agreement. DOD was not obligated to support TDPMIS for

any specific time. The agreements between DOD and NTIS make it perfectly clear that DOD could withdraw its support from TDPMIS upon notice. Accordingly, DOD could have ended TDPMIS by simply invoking its rights under the agreements with NTIS. While DMC argues that it had third party beneficiary rights under those agreements

not disputed that the government gave DMC the requisite notice, it fulfilled its obligations under the joint venture agreement.[18]

Moreover, to the extent there is any doubt that the government's motives in deciding to withdraw from the joint venture was to harm DMC, the reasons provided by Mr. Lawson, the head of NTIS, remove any doubt. DMC concedes that the withdrawal notice was sent by Mr. Lawson. Mr. Lawson justified his decision to withdraw from TDPMIS on the grounds that TDPMIS was not financially viable: "[S]ales are substantially below projections and we are unable to recover our costs, to say nothing of generating a profit. Moreover, we have no reason to believe this situation will change." Ronald Lawson March 5, 1999 Letter. Mr. Lawson explained that under his statutory mandate NTIS could only support self-sustaining ventures. DMC does not dispute the fact the TDPMIS was not making money or that NTIS' legislation requires that NTIS support self-sustaining projects. This undisputed fact alone supported the government's withdrawal from the joint venture, if a reason were needed.[19] In these circumstances, DMC's breach of contract claim on wrongful termination grounds fails for lack of both legal and factual support.

DMC's contention that DOD breached the termination clause by shutting down the data feeds after NTIS noticed its withdrawal from TDPMIS is also unsupported. Once NTIS withdrew from the agreement, DMC was eligible to receive DOD data, just not for free. DMC and ITG met with DOD about continuing TDPMIS and were told that they would now need to pay for any data under the Freedom of Information Act, like any other VAN. There was nothing in the joint venture agreement that gave DMC or ITG the right to continue to receive DOD data for free. DOD therefore did not breach the termination clause of the joint venture agreement by insisting that DMC and ITG pay for continued access to DOD data.

## D. NTIS did not breach the DMC Joint Venture Agreement

■ DMC's contentions that NTIS breached the joint venture agreement by failing to provide data it "could" have obtained from DOD and by allowing the ASTM licensing agreement[20] to lapse are without merit. As noted above, it is clear from the terms of the agreement, that NTIS would not be liable to DMC for "ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, DAMAGES AS A RESULT OF ITS NONPERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT." DMC/ITG/NTIS Amended Joint Venture Agreement 8. Because DMC is only seeking lost profits in connection with these claims, i.e. profits lost in not being able to sell DOD data and ASTM's standards online,[21] its claim is not valid un-

---

(an argument addressed infra 42), DMC does not dispute that DOD had the right to stop providing support to TDPMIS whenever it wished upon fulfilling the notice requirements to DOD.

18. DMC charges the government with violating the joint venture agreement by failing to discuss its decision to withdraw in advance of giving notice and by failing to work with DMC after NTIS' withdrawal to keep TDPMIS alive. DMC fails, however, to identify anything in the DMC agreement requiring advance notice of the government's decision or any specific obligation for cooperation. Absent any contract provision establishing those obligations they cannot give rise to a claim.

19. DMC makes much of the fact that Mr. Lawson stated that the reason for NTIS withdrawing from the agreement was based on the fact that sixty other web-based programs were competing with TDPMIS and that Mr. Lawson could not identify these other programs. The issue is irrel-

evant. To the extent the government needed any justification for its decision, it is provided by the fact that TDPMIS was not self-sustaining, contrary to NTIS' legislative mandate. The court has combed the thousands of pages filed by the plaintiffs and cannot find any evidence of the government withdrawing from TDPMIS in order to economically harm the joint venturers by depriving them of potential profits. TDPMIS never made any profit.

20. Beyond plaintiffs' argument that NTIS' failure to respond to a six-month extension offer by ASTM in a March 5, 1998 letter demonstrates a prior material breach, plaintiffs argue that when NTIS sent the SDO vendors notices of cancellation, the letter failed to include the remaining joint venturers' desire to maintain vendor relationships. This argument is equally without merit.

21. It is not disputed that hard copies of ASTM standards were still being sold through TDPMIS.

der the agreement. Because the claim for lost profits is a claim for "consequential damages," the claim must be dismissed. 3 Dobbs Law of Remedies § 12.4(3) (1993) ("The plaintiff's claim for a loss of business profits—a reduction in income . . .—is normally a claim for consequential damages.").

DMC's contention that NTIS breached the joint venture agreement by withdrawing from TDPMIS without a valid reason is also without merit. As discussed above, in connection with this same allegation regarding DOD, NTIS was free to withdraw from the joint venture agreement at will, i.e. for any reason. NTIS was simply required to provide the required notice. NTIS provided that notice and therefore did not breach the joint venture agreement.[22]

## E. Neither NTIS nor DOD Breached any Fiduciary Duty Owed DMC

 DMC asserts that the government's failure to disclose its commitment to Procurement Gateway and to be "entirely loyal to the purpose of the joint ventures" also amounted to a breach of the government's fiduciary duty to DMC under the joint venture agreement. Ordinarily, joint venturers are considered "partners" and as "partners" owe each other certain fiduciary duties. 46 Am.Jur.2d Joint Ventures § 33 (2002) ("Although it has been said that the scope of fiduciary duties owed between partners inter se is often broader than that owed by joint venturers inter se, as a general rule, the relationship between joint venturers, like that existing between partners, is fiduciary in character."). As noted above, the DMC joint venture agreement expressly states that the joint venturers are *not partners:* "Nothing in this Agreement constitutes or shall be construed to constitute any of the Parties as partners, and none of the Parties shall have any power or authority to bind the other or others in any respect." DMC/ITG/NTIS Amended Joint Venture Agreement 8. In such circumstances, the parties altered the normal joint venture obligations and provided that they would not owe any *fiduciary* duty to each other. 46 Am.Jur.2d Joint Ventures § 11 (2002) ("[W]here a written contract exists, that document will be controlling as to the parties' intention."). Where, as here, the terms of the joint venture agreement are plain, the court cannot read into the agreement a partnership or fiduciary obligations that did not exist.

## F. DMC's Third Party Beneficiary Claims fail as a matter of law

DMC argues that it is also entitled to damages under a third party beneficiary theory. In particular, DMC argues that it was a third party beneficiary to the interagency agreements between DOD and NTIS with regard to the flow of data from DOD to NTIS for TDPMIS. More specifically, DMC argues that DOD's failure to provide data from DSC–Columbus and DSC–Philadelphia harmed DMC because without DOD's procurement information it could not sell the procurement-related industry standards it was offering through TDPMIS.

The government argues that DMC's argument fails as a matter of law on the ground that inter-agency agreements are not enforceable by the government parties in court and thus cannot be enforced by private parties. In addition, the government argues that a review of the interagency agreements makes plain that DMC was not a third party beneficiary to the agreements in any case.

 Because the court agrees that DMC was not a third party beneficiary under the interagency agreements between DOD and NTIS, it finds that DMC's third party beneficiary claims fail as a matter of law and that it need not consider the government's enforceability argument.[23] Under the standards articulated by the Federal Circuit, "[t]hird party beneficiary status is an 'exceptional privilege' and, to avail oneself of this

---

**22.** Moreover, to the extent a reason was required, Mr. Lawson of NTIS provided a legitimate reason. See above.

**23.** The government argues that interagency agreements cannot create third party rights because they cannot be enforced in court by the government parties to the agreement. The government argues that interagency disputes are non-justiciable and thus third parties cannot enforce them either. As noted above, the court does not reach this argument.

exceptional privilege, a party must 'at least show that [the contract] was intended for his *direct* benefit.'" *Glass v. United States,* 258 F.3d 1349, 1354 (2001) (citing *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912) (emphasis added)); *see also U.S. Ecology, Inc. v. United States,* 245 F.3d 1352, 1357 (Fed.Cir.2001).

■ At issue in this case are three interagency agreements which provide a framework for the flow of information between certain DOD components and NTIS. DMC has not identified, and the court cannot find, any language in any of the three agreements that could be construed as suggesting that the agreements were intended for DMC's direct benefit. The first interagency agreement does not reference any third parties. Indeed, the MOA was entered into before the joint venture agreement was entered into by DMC. *See* ODUSD(AR/EC)/NTIS MOA. In such circumstances, the court would be hard pressed to find that the MOA was created to benefit DMC.

Next, the agreement between DOD and NTIS to provide information from DISA does not establish a third party beneficiary contract. While it is true that the agreement mentions the government's trading partners, it does not reference any of the joint venturers. Moreover, DMC does not present any evidence to suggest that the DISA agreement was breached. Finally, there is the DSC–Richmond agreement, which again does not provide DMC with any direct enforcement rights. In addition, DMC does not claim any breach of the DSC–Richmond agreement.

In its reply brief, DMC states that the breaches of its third party beneficiary rights occurred when DSC–Philadelphia and DSC–Columbus refused to furnish data and that those failures resulted in a breach. DMC states that these breaches occurred in the context of "the first [MOA] or recently signed inter-agency agreements not herein disclosed." Plaintiffs' Reply Brief 26.

As noted above, however, there is nothing in the MOA that can be construed as providing DMC with any direct benefit. Indeed, the MOA provides that DOD will not be responsible for errors in data conversions performed by non-government third parties:

> Any Agreement between a party to this Agreement and another non-government party for services connected with the conversion of data provided by [DSC–Richmond] will include a provision holding [DSC–Richmond] and NTIS harmless for any liability either party may incur by reason of inaccuracy in data conversion. The provision must stipulate that "to the extent [DSC–Richmond] and/or NTIS is found liable, the non-government parties will indemnify the Government for all damages arising out of any contract between DLA and its supplier as it relates to inaccurate data conversion."

DSC–Richmond/NTIS MOA 2. This clause plainly suggests that DOD was not intending to give rights to those non-government parties. Moreover, contrary to DMC's contentions, the court does not see how this MOA required that DSC–Philadelphia and DSC–Columbus provide NTIS with any specific data. The MOA states that the parties, DOD and NTIS, will "jointly determine the delivery methods and delivery schedule of information by and between both parties." *Id.* at 1. The evidence demonstrates NTIS was in the process of negotiating agreements with DSC–Philadelphia and DSC–Columbus, but that the agreements were never finalized. As such, NTIS and those DLA components never reached a joint decision regarding delivery methods or schedules. In such circumstances, the court cannot find that DMC had rights to enforce agreements that were never finalized. For all of these reasons, DMC's third party beneficiary claims fail as a matter of law.

## III. SDA's Claims

### A. NTIS did not breach the termination provisions of the SDA agreement

■ At the heart of SDA's claim for damages is its contention that NTIS breached the termination provisions of the SDA agreement when NTIS notified the SDOs, with whom NTIS had licensing agreements, that it was ending its relationship with ISRDN. SDA argues that NTIS should not have ter-

minated the licensing agreements but should instead have transferred the licensing agreements to SDA. SDA argues that under its agreement with NTIS, NTIS was prohibited from taking any unilateral action that might undermine ISRDN, including notifying SDOs of NTIS' decision to withdraw from ISRDN. SDA argues that by its actions, NTIS "prevented [SDA] from the opportunity to adopt a plan of informing the SDOs that [USA Information Systems] would be taking over the database and Web page function, as undoubtedly SDA would have done if it had received the type of cooperation to which it was entitled." Plaintiffs' Reply Brief 18.

The government argues that NTIS did not breach the agreement. According to the government, NTIS noticed its withdrawal from ISRDN on March 12, 1999, effective May 12, 1999. The government contends that during that sixty-day period, NTIS did not do anything to interfere with SDA's ability to find and designate a party that would continue ISRDN online. The government does not dispute that SDA initially informed NTIS of its desire to continue ISRDN, but the government argues that SDA never identified a designated party within the sixty days provided for in the agreement. Without a designation, the government argues that NTIS had no obligation to continue to assist SDA in a transition and was free to serve notice in July 1999 on the SDOs of NTIS' intention of terminating its licensing agreements with them. In particular, the government relies on section 6(d) of the SDA agreement, which states: *"In the event that either party withdraws from the Joint Venture, the withdrawing party will cooperate in the transition of it respective responsibilities to a designated party. Transition will be accomplished within 120 days after 60 days written notice."* (Emphasis added.) The government argues that SDA's failure to identify a designated party within the sixty-day notice period is fatal to its claim. SDA contends, in response, that it was not required to identify a designated party within the sixty-day termination period but had 120 days to work out a transition.

The court agrees with the government that SDA's failure to identify a party with whom NTIS could work with during the 120 days provided for a transition is fatal to its claim. The undisputed facts show that SDA may have intended to continue with ISRDN when it first learned of NTIS' withdrawal, however, SDA never gave NTIS any reason to believe that it intended to continue after May 1999 and the conclusion of the sixty days.[24] Moreover, once TDPMIS was terminated on June 23, 1999, and DMC would no longer be offering SDOs, NTIS would have had no reason to believe that SDA wished to continue with ISRDN either. Accordingly, NTIS did not breach the termination provision of the SDA joint venture agreement, when thirty days after the agreement had ended, NTIS notified the SDOs of its intention to end the licensing agreements with them. SDA's suggestion that the joint venture agreement required NTIS to keep ISRDN in tact for 120 days beyond the original sixty days, and to offer SDA the licensing agreements, even if SDA had not identified a party with whom NTIS was to work, is unsupported. NTIS was required to cooperate in a "transition" with a party who could continue NTIS' functions, the agreement did not require NTIS to cooperate with SDA without any indication of what entity would be taking on NTIS' role in ISRDN.[25]

**B. NTIS did not breach any fiduciary obligations to SDA**

Because NTIS did not breach any aspect of its agreement with SDA, NTIS is not

---

24. SDA argues that the term "designated party" in the agreement means SDA, and therefore, once SDA indicated it wanted to continue with ISRDN nothing more was required. While it may be true that SDA could have become the "designated party" it is also true that SDA never suggested that it would take on the responsibility of hosting the website for ISRDN. SDA never identified any party who could carry on NTIS' job of providing ISRDN data to the public.

25. SDA's contention that NTIS breached the joint venture agreement by terminating its agreements with ASTM and USA Information Systems before the sixty-day period had expired is not supported by the undisputed facts. The facts show that the ASTM on-line agreement terminated by its own terms without regard to the future of ISRDN, and that USA Information Systems did not receive a termination notice before July 1999.

liable to SDA for breach of any fiduciary obligation, assuming *arguendo* that such duties existed. As discussed above, NTIS fulfilled its termination obligations with SDA; therefore, even assuming *arguendo* that the SDA joint venture agreement created a fiduciary relationship between SDA and NTIS, there was no breach of those obligations.[26]

## CONCLUSION

Based on the foregoing, the defendant's motion for summary judgment is **GRANTED**. The plaintiffs' motion for summary judgment is **DENIED**. Each party to bear its own costs.

---

**26.** To the extent SDA contends that DOD had any responsibility for its damages, that conten-

tion fails for the same reasons that DMC's claims with respect to DOD's actions fail.