DATA MARKETING COMPANY OF VIRGINIA and Standards Development Association, Inc., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 03–5102.

United States Court of Appeals,
Federal Circuit.

Decided July 7, 2004.

July 8, 2004.

Before LOURIE, CLEVENGER, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Appellants Data Marketing Company of Virginia ("DMC") and Standards Development Association, Inc. ("SDA") (collectively, the "Companies") appeal from the decision by the United States Court of Federal Claims granting summary judgment in favor of the Government on the Companies' breach of contract, fiduciary duty, and good faith and fair dealing claims against the Department of Defense ("DOD") and the National Technology Information Service ("NTIS"). *Data Mktg. Co. of Va. &*

*Stds. Dev. Assoc., Inc.*, 55 Fed.Cl. 685 (2003). DMC and SDA each entered into joint venture agreements with NTIS to provide online access to DOD solicitations, technical drawings, and other bid proposal information. After NTIS terminated the agreements, DMC and SDA brought suit against DOD and NTIS. This appeal follows the Court of Federal Claims' dismissal of Appellants' claims following entry of summary judgment.

For the reasons discussed below, we agree with the Court of Federal Claims that Appellants have not demonstrated a genuine issue of material fact that could support (1) the Companies' claims against DOD or (2) DMC's claims against NTIS. With respect to SDA's claims against NTIS, however, we vacate the Court of Federal Claims' entry of summary judgment and remand for further proceedings on the narrow issue of whether, by refusing to accede to ASTM's contractual demands or by refusing to continue to negotiate an agreement with ASTM during the 60–day post-notification period, NTIS breached express or implied contractual provisions which required NTIS to cooperate in the transition of the ISRDN database to either SDA or its designate. In summary, we *affirm-in-part, vacate-in-part, and remand* the judgment of the Court of Federal Claims.

## BACKGROUND

### A. *Electronic Procurement Site*

In 1995, Barry Nelsen, a consultant to Western Tele–Communications Inc. ("WTCI"), proposed that DOD, NTIS, and WTCI jointly establish a website to permit the public, for a small fee, to access technical data that is referenced in DOD solicitations. At the time, vendors interested in bidding on a DOD contract had to separately locate specifications, standards, and drawings to prepare bid proposals. The

process of gathering this information deterred potential vendors and proved costly to DOD because DOD had to respond to Freedom of Information Act requests and chose among fewer vendors for goods and services.

To evaluate Mr. Nelsen's proposal, DOD commissioned Coopers & Lybrand, which later became PricewaterhouseCoopers ("PWC"). PWC recommended the procurement project with the caveat that NTIS should independently manage the relationship with WTCI. As PWC noted, DOD already was funding other nascent efforts to provide procurement information online; PWC therefore recommended that DOD avoid the appearance of favoring WTCI over other potential procurement web developers. DOD approved the project, provided some funding to NTIS, and structured the project such that it would provide proposal data to NTIS, who in turn would develop the website with WTCI.

### B. *Interagency Agreements Between NTIS and DOD*

To obtain the technical data needed for the website, NTIS entered into a series of interagency agreements with various DOD divisions. Neither DMC nor SDA were parties to these contracts.

In January 1997, NTIS entered into a Memorandum of Agreement ("MOA") with DOD's Office of the Deputy Under Secretary of Defense (Acquisition Reform/Electronic Commerce). Under the MOA, DOD was to provide unclassified data, including solicitations and related technical information, to NTIS in an electronic format. For its part, NTIS agreed to be a "non-exclusive distributor to the public" of DOD's information. The parties also agreed to jointly determine the scope, content, format, and delivery of the information.

NTIS next entered into an MOA with a Defense Supply Center ("DSC") in Richmond (the "NTIS–Richmond Agreement"). DSC–Richmond agreed to provide NTIS with unclassified data packages and engineering drawings. DSC–Richmond and NTIS also agreed to jointly develop the criteria for transferring information. NTIS agreed to be a non-exclusive distributor of the information transferred from DSC–Richmond.

In addition to its relationship with DSC–Richmond, NTIS entered into draft agreements with other Defense Supply Centers, specifically those in Philadelphia and Columbus, to provide technical data to NTIS. While these agreements were never finalized, both DSC–Philadelphia and DSC–Columbus periodically supplied NTIS with data and drawings.

The last interagency agreement of note was signed in November 1997 between NTIS and the Defense Information Systems Agency ("DISA"), a division of DOD (the "NTIS–DISA Agreement"). The NTIS–DISA Agreement required DISA to provide access to certain types of Requests for Quotations and Requests for Proposals known as "840 transactions" as soon as the procurement system was "ready for deployment" and had satisfied certain compatibility and testing requirements.[1]

C. *Third–Party Agreements*

In addition to arranging to receive data from DOD sources, NTIS entered into joint venture agreements with Appellants to create and market an online, one-stop shopping site for procurement information.

NTIS contracted with DMC regarding the provision of technical data and solicitations on the website and also entered into a separate agreement with SDA regarding the provision of industry standards.

1. *The DMC Agreement*

In June 1996, NTIS signed a joint venture agreement with WTCI to create the online procurement system, which the parties named the Technical Data Package Management Information System (the "TDPMIS"). This initial agreement was amended in August 1997. In the amended agreement (the "DMC Agreement"), DMC was added as a party and WTCI was replaced with WTCI's wholly owned subsidiary, Intessera Technologies Group, Inc. ("ITG").[2] It is important to note that DOD was not a party to the DMC Agreement.

Under the DMC Agreement, each party agreed to perform specific tasks to further the development of the online procurement system. DMC was a marketing firm headed by Mr. Nelsen. Under Section 3.3 of the DMC Agreement, DMC's role in the joint venture was to provide consulting, planning, and marketing services for the procurement website. Among other obligations, DMC agreed to develop and maintain "comprehensive marketing and sales plans" and sales literature, and assist the NTIS and ITG in "establishing contacts and meetings with key DoD management and technical personnel."

ITG provided the technical services for the website under the DMC Agreement. In Section 3.1 of the agreement, ITG

1. At the time of the second agreement, DISA transmitted information to the public through Value Added Networks ("VANs"), which were public networks where vendors could go to access DOD information. VANs paid fees to the DOD for this data, unlike the agreements the DOD had with NTIS. As a government entity, NTIS could not qualify as a VAN per se.

2. ITG had earlier developed a search engine called SpecFinder to search the technical data and drawings that would be provided on the website.

agreed to develop, manage, and provide the software and telecommunications support necessary to distribute the technical data to the public via the internet. In addition, ITG was required to process the raw data it received from NTIS.

Like ITG, NTIS's responsibilities under the DMC Agreement were also relatively technical. NTIS's basic obligation, as stated in Section 3.2 of the DMC Agreement, was to "provide the ICP [i.e., DOD] Data . . . and JEDMICS [technical] drawings to ITG . . . and develop and provide marketing and billing support for TDPMIS and [ITG's search engine for the website]." In Section 3.2(ii), NTIS specifically agreed to "provide to ITG . . . all Raw Data *received by NTIS* [from the DOD] . . ., at all times as promptly as is practicable, without impeding or interfering the flow of Raw Data from the [DOD]." (Emphasis added).

The termination provisions for the DMC Agreement were set out in Section 5. Under Section 5.2, any party could terminate the agreement with 180 days advance written notice once the website was in its "operational phase." Section 5.3 further stated that after termination, "no party shall have any further liability or obligation to perform any of its covenants or obligations under this Agreement" with the exception of Sections 8, 12, 14, 15, and 16, which provided for, respectively, limitations on liability, a no-hire period, the protection of confidential information, the distribution of intellectual property rights, and specific limitations on assignment. Section 5.3 also permitted the remaining parties to continue under the DMC Agreement, but did not impose any affirmative obligations on the terminating party to continue providing any services to the remaining joint venture parties.

2. *The SDA Agreement*

In addition to creating a technical database for DOD procurements, the parties agreed to create a procurement website to provide access to non-governmental and military standards that are commonly referred to in DOD solicitations. To achieve this goal, in August 1996 NTIS entered into an agreement with SDA (the "SDA Agreement") to develop relationships with the organizations that create industry standards, i.e., standards development organizations (SDOs). The only signatories to the SDA Agreement were SDA and NTIS; as with the DMC Agreement, the DOD was not a party.

The database of industrial and military standards created by SDA and NTIS was named the Industry Standards Repository and Distribution Network (the "ISRDN" or the "Standards Database"). Under the SDA Agreement, SDA, which was also headed by Mr. Nelsen, agreed to help NTIS form contracts with SDOs, many of which already had business relationships with Mr. Nelsen. SDA's role therefore was to contact SDOs and facilitate contracts between NTIS and SDOs. NTIS's role in forming the Standards Database, set forth in Section 1.2 of the SDA Agreement, was to provide marketing and billing services and also to provide the information processing necessary to place the standards online.

Under the SDA Agreement, any party could terminate at will with 60 days notice. Under Section 6(b), Section 6(d), and Section 11 of the SDA Agreement, the parties retained certain specific obligations to each other in the event of termination:

6(b) Any Joint Venture Partner, with 60 days written notice to all parties, may withdraw from this Agreement, *leaving the ISRDN project intact.*

(d) In the event that either party withdraws from the Joint Venture, *the withdrawing party will cooperate in*

*the transition of its respective responsibilities to a designated party. Transition will be accomplished within 120 days after 60 days written notice.*

11. *Continuation of Operations.* The parties agree that within fourteen (14) days from the termination or expiration of this Agreement, all software, hardware, documentation or materials belonging to one party shall be returned to the other party and no copies of software or documentation shall be retained by the other party. *Any party withdrawing under Section 6 shall allow, to the extent allowable under their control, ISRDN to retain licenses previously provided by that party to the extent that such licenses are necessary for ISRDN to continue uninterrupted.*

(Emphasis added).

Following the signing of the SDA Agreement, NTIS entered into a series of contracts with SDOs, USA Information Systems ("USAIS"), which provided military specifications, and the American Society for Testing and Materials ("ASTM"), which provided common industry standards.[3] SDA was not a party to any of the agreements between NTIS and the SDOs.

D. *Termination of Agreements*

In late 1998 and early 1999, the procurement system, including the TDPMIS and Standards Database, began to experience difficulties. DOD was extensively funding Procurement Gateway, a competing system that provided solicitation information for free to the public rather than for a fee.

In addition, NTIS's projects with Appellants experienced data disruptions and technical hiccups. For example, the DSC–Columbus and DSC–Philadelphia sites intermittently stopped providing technical data on DOD procurements without explanation, ITG was forced to reprogram its search engine for the site, and NTIS had to undertake extensive debugging and programming to integrate the military standards into the Standards Database.

In December 1998, NTIS appointed a new director for the procurement project, Mr. Jerry Harper, who began a financial review of the website. Under its enacting mandates, NTIS was required to become self-sufficient. The financial review confirmed that NTIS had been experiencing heavy losses in funding the website. On January 29, 1999, NTIS representatives met with Mr. Nelsen and members of ITG to discuss the financial viability of the project, especially in light of the free services provided by Procurement Gateway.

On March 5, 1999, NTIS gave notice to DMC and ITG that it intended to terminate the DMC Agreement. In its notice, NTIS explained that "the environment for delivering procurement-related technical data has changed" and that NTIS could not continue to incur the substantial losses associated with the joint venture. NTIS gave thirty days notice of termination, which it later extended to 180 days, and informed ITG and DMC that if they wanted to continue the venture, they should contact DOD.

A week later, on March 12, 1999, NTIS sent a letter of termination to SDA stating NTIS's intent to withdraw from the SDA Agreement. NTIS provided SDA with 60

---

**3.** NTIS also formed contracts with: Manufacturers Standardization Society of the Valve and Fittings Industry, Inc.; American Society of Heating, Refrigerating and Air–Conditioning Engineers, Inc.; Acoustical Society of America; National Fire Protection Association; Aerospace Industries Association of America, Inc.; Instrument Society of America; and Society of Automotive Engineers, Inc.

days notice, per Section 6(b) of the agreement.

### E. Post–Notification Actions

After giving notice of termination for both the DMC Agreement and the SDA Agreement, NTIS was obligated to continue its responsibilities for 180 days and 60 days respectively. Most of Appellants' complaints arise from NTIS's activities during these "post-notification" periods for the contracts.

### 1. Post–Notification Period of DMC Agreement

After NTIS gave notice of its intent to terminate the DMC Agreement, representatives from NTIS, ITG, and DMC met with DOD regarding how to continue the TDPMIS project. At this meeting on March 25, 1999, DOD informed ITG that it would be required to pay for the data feeds it had previously received for free from the NTIS. In addition, ITG would have to fulfill the technical requirements necessary to establish itself as a "Value Added Network ('VAN'), a specific type of publicly accessible network already used by other companies to provide DOD data. In other words, ITG would be placed in the same position as other companies hawking DOD data online."

In the months following the meeting with DOD before the termination date for the DMC Agreement, DMC alleges that it continued to experience data interruptions from DOD. Specifically, DMC argues that the Defense Supply Center at Columbus (DSC–Columbus) intentionally cut off data feeds in November 1998 and then terminated its data feeds permanently in March 1999. DMC also alleged that DOD interfered with data feeds from DSC–Philadelphia.

On June 13, 1999, ITG and DMC signed a termination agreement with NTIS, ending early the 180–day notice period.

### 2. SDA Agreement's Post–Notification Period

On March 12, 1999, the same day that NTIS gave notice to SDA, NTIS sent a letter to ASTM stating that it would not continue negotiating a renewal agreement relating to the provision of ASTM's standards online. ASTM and NTIS had previously entered into a series of short-term contracts for a "test period" for online provision of ASTM standards. In late 1998, ASTM requested that the NTIS enter into another short-term contract and incorporate extensive copyright notices on the websites related to ASTM standards. NTIS's refusal to negotiate terminated the online provision of ASTM standards; paper copies of standards remained available. When ASTM president Robert Meltzer received NTIS's letter regarding renewal, he wrote to Barry Nelsen to tell him of the letter and stated, "What a surprise that was," suggesting that the end of negotiations was unexpected. SDA argues that NTIS's interaction with ASTM was ill advised and not in good faith.

SDA also placed into evidence an e-mail from Mr. Steve Murdock, who headed USAIS. Mr. Murdock had received an e-mail from Mr. Nelsen informing him that NTIS had cancelled its online agreement with ASTM. In a response dated March 22, 1999, Mr. Murdock wrote to Mr. Nelsen that he had "talked to NTIS myself on Friday and they will be canceling as well." The record shows, however, that the USAIS agreement was terminated on July 31, 1999, well after the end of the 60–day post-notification period. In an April 1999 letter, Mr. Nelsen asserted that NTIS was impairing the Standards Database.

In further support of the proposition that NTIS did not cooperate in transferring the database, SDA points to the deposition testimony of Mr. Harper, the project manager for the procurement project, who admitted that he informed a potential customer that he should go directly to the SDO instead of through the online system.

During the post-notification period, SDA never requested in writing that it or any other partner be designated to replace NTIS in the joint venture. NTIS offered to assist SDA in negotiating "replacement" agreements with the SDOs, but Mr. Nelsen testified did not accept this offer, citing the damaged relationships with SDOs created by NTIS's actions.

On July 1, 1999, after expiration of the 60–day post-notification period, NTIS sent notices of termination to the organizations that had provided non-governmental standards to the ISRDN. By August 8, 2000, all the standards had been deleted from the NTIS systems and paper copies had been destroyed.

F. *The Litigation*

On October 3, 2001, DMC and SDA brought suit in the Court of Federal Claims against DOD and NTIS on a variety of legal theories. DMC alleged that DOD breached the DMC Agreement by (1) funding competitors, (2) failing to provide data, especially from the DMC–Philadelphia and DMC–Columbus sites, and (3) directing NTIS to terminate the joint ventures. DMC also argued that it was a third party beneficiary to the contracts that NTIS had with DOD regarding data feeds.

DMC also brought claims against the NTIS. DMC alleged that NTIS breached the DMC Agreement and violated its fiduciary duties and duties of good faith (1) by failing to provide for dataflow from DOD and (2) by not providing an appropriate reason for terminating the contract.

SDA similarly raised claims against both DOD and NTIS. SDA claimed that DOD forced NTIS to terminate the SDA Agreement, thereby breaching its fiduciary duty and duty of good faith. SDA also brought claims against NTIS, alleging that NTIS breached the termination provisions of the SDA Agreement by (1) impairing relationships with SDOs, (2) compromising the Standards Database during the post-notification period, and (3) failing to transfer license agreements with SDOs to SDA and otherwise assist SDA after termination in replacing NTIS in the joint venture. SDA further alleged that NTIS violated fiduciary duties and the duty of good faith in its interaction with SDA during the post-termination period.

On the Government's motion for summary judgment, the Court of Federal Claims found that DOD lacked privity of contract with either SDA or DMC and that neither Company presented evidence that NTIS acted as DOD's agent. In addition, the court rejected the Companies' claims that they were third party beneficiaries of the interagency agreements between NTIS and DOD. The Court of Federal Claims stated that none of the agreements between NTIS and DOD referred specifically to Appellants nor provided them with any enforceable rights.

DMC's claims against NTIS fared no better. The Court of Federal Claims noted that DMC requested only lost profits as compensation. The court equated lost profits with "consequential damages." Given that Section 8 of the DMC Agreement shielded NTIS from "consequential" damages, the court dismissed DMC's claims for relief. The court also determined that DMC's allegation that NTIS improperly terminated the agreement could not constitute a claim for breach

because the DMC Agreement could be terminated at will. Finally, the court dismissed DMC's claims that NTIS violated its fiduciary duty by noting that Section 9 of the DMC Agreement expressly stated that the relationship between the parties would not be that of a partnership, which the court understood to mean that none of the venturers owed a fiduciary duty to each other.

In evaluating SDA's claims against NTIS, the Court of Federal Claims found no evidence to support SDA's assertion that it had designated a party to undertake NTIS's role in the SDA Agreement within 60 days of the termination notice from NTIS. Based on this "fatal" flaw, the court held that NTIS did not breach the SDA agreement by terminating its license agreements with the SDOs in July 1999, after the end of the 60–day post-notification period.

DMC and SDA appeal the Court of Federal Claims' decision to this Court, which has jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### A. Standard of Review

This Court reviews a grant of summary judgment de novo. *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1292 (Fed. Cir.2002). Summary judgment is appropriate if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56. If the non-moving party cannot carry its burden of proof with respect to an essential element of its claim, summary judgment should be granted in favor of the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The interpretation of a contract is also a legal question subject to de novo review.

*Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998); *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed.Cir.1997).

### B. Claims Against DOD

To prevail on their contractual and fiduciary duty claims against DOD, the Appellants must first demonstrate that DOD had a legal duty toward the Appellants. Because DOD is not a party to either the DMC Agreement or the SDA Agreement, the Companies argue that a duty arises because NTIS acted as DOD's agent. In addition, the Companies insist that they are third party beneficiaries of the interagency agreements between DOD and NTIS and therefore can collect damages for DOD's failure to transmit regular data from DSC–Columbus and DSC–Philadelphia. Both arguments lack evidentiary support and were correctly dismissed by the Court of Federal Claims on summary judgment.

### 1. Agency Claims

■ An agency relationship requires mutual consent between the parties whereby one party agrees to act on behalf of the other party and under its direction and control. *B & G Enters., Ltd. v. United States*, 220 F.3d 1318, 1323 (Fed.Cir.2000). Contracting with one governmental agency typically does not create a contract with any other agency. *Town of Kure Beach v. United States*, 168 Ct.Cl. 597, 608–12 (1964). A narrow exception to this rule exists only when one agency has an "intimate relationship" with the other agency; for example, when an agency acts to procure goods or services specifically for another agency. *See, e.g., L.W. Foster Sportswear Co. v. United States*, 186 Ct.Cl. 499, 511, 405 F.2d 1285 (1969) (successor purchasing agent responsible for knowing prior practice of predecessor); *J.A. Jones*

*Const. Co. v. United States,* 182 Ct.Cl. 615, 627, 390 F.2d 886 (1968) (because Marine Corps was operating *completely* on behalf of the Air Force, both were charged with knowledge of the others' actions).

In the present case, Appellants offers no evidence to support their allegation that DOD controlled or otherwise directed NTIS's efforts to create the procurement site and that NTIS manifested its assent to such management by DOD. Pursuant to the written agreements between the agencies, both DOD and NTIS agreed to share responsibility for determining the content, format, and delivery methods of DOD data to the public. DOD did not share in the profits derived from the joint ventures, nor was it contractually responsible for the programming, billing, or management performed by NTIS. Appellants' "evidence" to the contrary is an agreement between PWC and ITG regarding the details of how ITG would receive DOD data; this agreement does not establish direct control by DOD nor an assent by NTIS of such control and therefore is insufficient to support an allegation of agency. The Companies also cite to PWC progress reports and e-mails from DOD, but such citations show only that DOD responded to action items relating to how DOD provided information to NTIS. The Companies have presented no evidence that DOD overstepped its role as the information supplier and exercised control over NTIS's management and operation of the procurement system.

### 2. *Third-party Beneficiary Claims*

█ DMC and SDA also claim on appeal that they should be entitled to enforce the interagency agreements between DOD and NTIS and receive damages for DOD's intermittent data transmission failures. After reviewing the agreements, however, we conclude that they were not designed for the benefit of Appellants and therefore confer no third-party beneficiary rights.

Under this Court's precedent, "[t]hird party beneficiary status is an exceptional privilege" that requires a party to "at least show that [the contract] was intended for his direct benefit." *Glass v. United States,* 258 F.3d 1349, 1354 (2001) (internal citations omitted). In this case, none of the three agreements executed between the DOD and NTIS refer to Appellants directly or indirectly. The agreements establish that certain data was to flow from DOD to NTIS. What NTIS did with the data afterward was not the subject or focus of the agreements. As a matter of law, the agreements therefore cannot be seen to establish a direct benefit entitling Appellants to the status and rights of a third-party beneficiary.

### C. *DMC's Claims Against NTIS*

On appeal, DMC argues that NTIS breached the DMC Agreement by failing to maintain the flow of data from DOD and by not providing an appropriate reason for terminating the contract. Even if we were to assume both allegations were true, however, NTIS's actions would not constitute a breach of the DMC Agreement. Under the terms of the DMC Agreement, NTIS had neither a duty to maintain data flow nor a duty to provide a reason for terminating the agreement.

█ As the Court of Federal Claims noted, Section 5 of the DMC Agreement does not impose any limits on termination other than the provision of notice. Such an openended termination provision means that the DMC Agreement was terminable at will and therefore could be terminated for any reason. *See, e.g., Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 589 (7th Cir.2000); *Major Oldsmobile, inc. v. Gen. Motors Corp.,* 101 F.3d 684 (2nd Cir.1996); *Triangle Mining*

*Co., Inc. v. Stauffer Chem. Co.,* 753 F.2d 734, 740 (9th Cir.1985). We therefore conclude that DMC has not shown entitlement to a trial on the issue of an inappropriate termination.

■ DMC's argument concerning DOD's transmission of data similarly fails to find a firm foothold in the text of the DMC Agreement. Section 5.3 of the DMC Agreement provides that the obligations of a party to the joint venture *end* upon the termination of the joint venture. DMC's main claim against NTIS is that the agency failed to ensure that ITG and DMC would continue to receive data flow after NTIS terminated its part of the venture. In other words, DMC believes NTIS breached the DMC Agreement because DMC and ITG would have had to pay DOD for information after NTIS withdrew from the partnership.

DMC basically requests that we "rewrite the contract, and insert words the parties never agreed to," an action that "we do not have the authority to do." *George Hyman Constr. Co. v. United States,* 832 F.2d 574, 581 (Fed.Cir.1987). If DMC wanted to protect its data flow from the DOD in the event of withdrawal by NTIS, it could have insisted that DOD become a party to the agreement or affirmatively required NTIS to continue to provide data after withdrawal. The failure of DMC to adequately protect its data flow cannot be solved by this Court.

■ DMC further argues that NTIS breached the DMC Agreement because DOD intermittently failed to transmit data. This argument again fails to appreciate the limited obligations of NTIS under the DMC Agreement. NTIS did not undertake any responsibility to establish or maintain a data flow with DOD. Instead, under Section 3.2(ii) of the DMC Agreement, NTIS promised DMC that any information NTIS *received* from DOD would be transmitted to ITG and DMC. DMC has failed to put forth a genuine issue of material fact supporting anything more than the fact that DMC experienced a data interruption *because of DOD.* NTIS's goal was to transmit data it received; if NTIS did not receive the data, it did not have to transmit anything to DMC.

■ As a final matter, we note that the Court of Federal Claims committed harmless error by determining that NTIS could not recover lost profits because the DMC Agreement excluded consequential or incidental losses. Our recent decision in *Energy Capital Corp. v. United States* establishes that a loss of profits claim that flows directly from the contract is not necessarily a form of consequential or incidental damages. 302 F.3d 1314 (Fed.Cir.2002). Consequential or incidental damages are those that are speculative or otherwise not foreseen by the parties. Lost profits are not necessarily speculative or consequential per se. *See Computrol, Inc. v. Newtrend L.P.,* 203 F.3d 1064, 1071n.5 (8th Cir.1999) (stating that lost profits may be recovered even if there is a contractual clause excluding liability for incidental or consequential damages); *see also Moore v. Boating Indus. Assoc.,* 754 F.2d 698, 717 (7th Cir.1985), *vacated* on other grounds (holding that lost profits should typically be considered direct damages rather than consequential damages in a business contract). While the Court of Federal Claims should not have dismissed Appellants' lost profits claims as per se "consequential," this error is harmless because NTIS did not owe Appellants' any data other than that received from DOD during the term of the contract.

We have reviewed DMC's other claims of error and find them without merit. We therefore affirm the dismissal of all of DMC's claims against the Government.

### D. SDA's Claims Against NTIS

On appeal, SDA contends that the Court of Federal Claims erred in dismissing its claim that NTIS breached express and implied contractual provisions that required NTIS to cooperate in the transition of the ISRDN database to SDA or its designate. SDA argues that NTIS breached the SDA Agreement by (1) failing to transfer license agreements NTIS had with SDOs to SDA and by (2) refusing to accede to ASTM's contractual demands, or by refusing to negotiate with ASTM during the 60–day post-notification period. We agree with SDA that it raised a genuine issue of material fact on the second of these charges, but not on the first.

### 1. License Transfer

■ SDA argues that the court below erred in its conclusion that SDA failed to designate a party that would replace NTIS. We affirm the Court of Federal Claims' determination. SDA has presented conflicting stories regarding its "designation" of a replacement. Mr. Nelsen has testified that he attempted to discuss with NTIS a possible transition of NTIS's technical responsibilities to USAIS. In this appeal, SDA argues that it designated itself to undertake NTIS's role. SDA cannot point to any consistent evidence that it conveyed to NTIS its intent to have USAIS or itself assume the role of NTIS in the SDA Agreement. A mere allegation that a genuine issue of material fact exists is not sufficient to evade summary judgment; if a non-movant will bear a burden at trial, he must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324, 106 S.Ct. 2548 (internal citations omitted). SDA admits that it did not formally request to

assume NTIS's responsibilities under the SDA Agreement, and has not sustained its burden of providing evidence that suggests a designation otherwise occurred.

Because SDA failed to present evidence that it designated a replacement for NTIS during the 60–day period, there is no genuine issue that NTIS refused to cooperate by failing to transfer NTIS–SDO licenses to SDA. Accordingly, NTIS was absolved of any duty to cooperate after the conclusion of the 60–day period.

### 2. The ASTM Agreement

■ SDA also appeals the Court of Federal Claims' determination that the lack of a designation for the SDA Agreement was a "fatal" flaw justifying dismissal of all of SDA's breach of contract claims. We agree with SDA that this decision by the Court of Federal Claims was in error. Beyond allegations concerning the license transfers, SDA also asserted breach of NTIS's duty to cooperate, based on the breakdown of negotiations between NTIS and ASTM at the outset of the 60–day post-notification period. In particular, SDA charges that NTIS's refusal to accede to ASTM's demands, or to continue negotiations with ASTM, was in bad faith and damaged the ISRDN database, thus showing a breach of contract by NTIS. We remand for more proceedings on this issue.

SDA argues that the NTIS's termination of negotiations with ASTM concerning an online agreement was improper. Among other allegations, SDA's relies on the fact that: (1) NTIS terminated its negotiations with ASTM the same day as it gave notice to SDA; (2) the reasons for ceasing negotiations were specious because (a) NTIS had earlier agreed to a six month contract for online provision of the standards and (b) the copyright terms that NTIS found objectionable were very similar to ones that NTIS had agreed to in the past in con-

tracts relating to the *paper* provision of ASTM standards; (3) ASTM was the largest standards supplier for the Standards Database and hence important to the database and for marketing; and (4) both Mr. Nelsen and ASTM's President appeared to express surprise at the NTIS's actions in ending negotiations. On the record before us, we cannot be certain that no reasonable fact finder could conclude that NTIS ceased negotiations with ASTM in other than good faith, and that if the same were proved that the value of ISRDN to SDA might be reduced. SDA contends that the same acts alleged as breaches of the express and implied duty to cooperate are also evidence of breaches of the fiduciary duties of loyalty, full disclosure, and promotion of the success of the venture. As part of the remand proceedings, the trial court should address this issue.

## CONCLUSION

While the Court of Federal Claims properly dismissed Appellants claims against DOD and DMC's claims against NTIS, the court erred in dismissing SDA's claim of breach of express and implied contractual provisions that required NTIS to cooperate in the transition of ISRDN by exercising good faith efforts to keep it intact through the participation of ASTM. Accordingly, we vacate the Court of Federal Claims' entry of summary judgment and remand for further proceedings. We thus affirm-in-part, vacate-in-part, and remand.

## COSTS

No costs.